CHESTER RESIDENTS CONCERNED FOR QUALITY LIVING, et al.

v.

James M. SEIF, in his capacity as Secretary of the Pennsylvania Department of Environmental Protection, et al.

Civil Action No. 96–3960.

United States District Court, E.D. Pennsylvania.

Nov. 5, 1996.

Michael Churchill, Jerome Balter, Public Interest Law Center of Philadelphia, Philadelphia, PA, Gilbert Paul Carrasco, Villanova University, Villanova Law School, Villanova, PA, for Chester Residents Concerned for Quality Living, Zulene Mayfield, Cathy Morse, Ossie Morse, King McDonald, Angela McDonald, Carlene P. Stevenson, Louis S. Morse, Rick Otten, Linda Morse Rothwell, Arthur H. Rothwell, III, Margarita Santiago, Ricardo Santiago, Daniel Murphy, Janet Weiss, Reagan Otten, Renee D. Dale, Frances Rothwell, Lisa Gilliam.

Mark L. Freed, Comm. of Pa–Dept. of Environmental Resources, Conshohocken, PA, for James M. Seif, The Pennsylvania Department of Environmental Protection, Carol R. Collier, Pennsylvania Department of Environmental Protection—Southeast Region.

Mark L. Gross, Dept. of Justice, Civil Rights Division, Washington, DC, for U.S.

## MEMORANDUM

DALZELL, District Judge.

This case arises out of the process defendants employ to issue permits for the construction of waste facilities. In particular, at issue is their grant of a waste facility permit to Soil Remediation Services, Inc., to open such a facility in the City of Chester, a community in southeastern Pennsylvania with a predominantly African–American population.[1] Compl. at ¶ 21.

Plaintiffs are residents of Chester and Chester Residents Concerned for Quality Living, a Pennsylvania non-profit corporation (which we shall refer to collectively as "Chester Residents"). Chester is in Delaware County, which has a population that is 86.5% white and 11.2% black. Compl. at ¶ 25(a). The Chester Residents allege violations of Title VI, 42 U.S.C. § 2000d *et seq.*,[2] and the EPA's regulations adopted pursuant thereto.[3]

1. The plaintiffs allege that Chester Township has a population of 5,399, of which 53.6% are black and 45% are white, and that the City of Chester, which has a population of 41,856, has a population that is 65.2% black and 33.5% white; by these demographic realities, blacks are alleged to be unduly burdened by defendants' actions. For the sake of brevity, we shall refer to both the City of Chester and Chester Township as "Chester".

2. Section 601 of Title VI of the Civil Rights Act of 1964 provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

3. Section 602 of Title VI authorizes agencies, such as the Environmental Protection Agency ("EPA"), which provide financial assistance:

to effectuate the provisions of Section 2000d of this title ... by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute ...

42 U.S.C. § 2000d–1.

The EPA has promulgated civil rights regulations pursuant to § 602 of Title VI, 40 C.F.R. § 7.10 *et seq.*, which in relevant part provides:

A recipient [of federal financial assistance] shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.

40 C.F.R. § 7.35(b).

In addition, the EPA requires:

Applicants for EPA assistance [to] submit an assurance with their applications stating that, with respect to their programs or activities that receive EPA assistance, they will comply with the requirements of this Part.

40 C.F.R. § 7.80(a).

Defendants in this suit are James M. Seif, the Commonwealth's Secretary of the Department of Environmental Protection ("DEP"), solely in his official capacity, as well as Carol R. Collier, solely in her capacity as DEP's director of the Southeastern Region. Plaintiffs also name DEP itself (Compl. ¶ 5) and the Southwest Regional subdivision of the DEP (Compl. ¶ 7) as defendants.

The Chester Residents essentially argue that the process defendants use to determine whether to grant a waste facility permit has the effect of discriminating against them by concentrating the burden of pollution and the negative health effects it causes, within the African–American community in Chester while leaving the white residents of Delaware County essentially free of the pollution their waste caused. *See* Compl. at ¶¶ 31, 44. In this regard, the United States Environmental Protection Agency has noted that:

> The City of Chester has among the highest concentration of industrial facilities in Pennsylvania. Chester hosts a number of waste processing plants ... all solid waste from Delaware County is incinerated in Chester and at least 85% of raw sewage and associated sludge is treated there. A large infectious medical waste facility was also recently sited in Chester. Many of the plants are located in close proximity to low income, minority residential neighborhoods. In fact, a clustering of waste treatment facilities have been permitted within 100 feet of over 200 Chester homes.

> Chester residents are concerned about the health effects of living and working amid toxic substances and complain of frequent illness. Of [all the] cities of the State [*sic*], Chester has the highest infant mortality rate ... and the highest death rate due to certain malignant tumors.

Compl. at 2 (quoting EPA Draft Environmental Justice Strategy for Executive Order No. 12898, January 1995) (alteration added in original). Plaintiffs contend that by placing this disparate burden upon the African–American community of Chester, defendants violated Title VI and the EPA's regulations

promulgated thereunder. Compl. at ¶¶ 51, 55, 58.

Defendants move for dismissal, arguing, *inter alia,* that (i) plaintiffs have failed to state a claim under Title VI because they did not allege discriminatory intent, and (ii) plaintiffs have failed to state a claim under EPA the regulations because there is no private right of action under them.[4]

*Plaintiffs' Attempt to Amend Through Their Response*

■ Plaintiffs, apparently realizing the error in their complaint, allege discriminatory intent in their response to defendants' motion, Pls.Resp.Br. at 5–9, contending that the Court can infer intent from the troubling facts about the unequal distribution of waste facilities in Delaware County. Pls.Resp.Br. at 5 (quoting *Village of Arlington Heights v. Metro Housing Dev.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

In particular, plaintiffs point to the defendants' grant since 1987 of five waste facility permits for facilities to be located within Chester that would increase the total permit waste capacity by over 2,000,000 tons per year. Pls.Resp.Br. at 6. This capacity was in addition to the permit capacity of the DELCORA plant, operating in Chester, which "had a permit for a sewage waste facility to treat 44,000,000 gallons of sewage a day and an air quality permit to incinerate 17,500 tons per year of sewage sludge." Pls. Resp.Br. at 6.

Plaintiffs also point out that "the two waste facilities granted permits outside [Chester] since 1987 each had a permit capacity of 700 tons per year and that each was located in a Census Tract where the population was predominately white." Pls.Resp.Br. at 7. In addition, "only two Census Tracts in all of Delaware County contained more than one waste facility and both of these were located in areas with populations that were predominately African–American." Pls. resp. Br. at 7. In contrast, "Delaware County has a total of 112 census tracts in which the population is more than 50% white; 8 of these census tracts have one waste facility

---

4. The United States Department of Justice and Environmental Protection Agency have filed a brief on behalf of the United States as *amicus curiae* in opposition to the motion to dismiss.

each and 104 census tracts have no waste facilities at all." Pls.Resp.Br. at 7.

Plaintiffs may well have met their pleading burden in their response brief when they allege that:

In the period from 1987 to the present time defendants' so-called race-neutral waste permit program has issued permits which have the clear and obvious effect of subjecting African–Americans to racial discrimination. Despite the ever increasing disparity which defendants' program has caused defendants have maintained their so-called race-neutral program in the mistaken belief that race-neutrality would serve them as a complete defense against charges that defendants have violated Title VI.

Defendants' refusal to modify their failed waste permit program during this ten year period must be deemed to be the *functional equivalent* of a smoking-gun intentional discrimination which makes defendants liable for violation of Title VI.

Pls.Resp.Br. at 9 (emphasis in original). However, our Court of Appeals has counseled us that:

It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint.... Thus, ... the legal theories set forth in [the parties'] brief are helpful only to the extent that they find support in the allegations set forth in the complaint. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."

*Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173 (3d Cir.1988) (alteration supplied and in the original) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)). Given our Court of Appeals's teaching, we shall examine the sufficiency of the plaintiffs' pleadings under their original allegations of discriminatory effect rather than allowing informal amendment through their response brief.

*Implied Cause of Action Under Title VI*

■ At this late date it is clear that there is an implied cause of action under Title VI itself. *See Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *see also Chowdhury v. Reading Hospital & Medical Center,* 677 F.2d 317, 320 (3d Cir.1982), *cert. denied* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983); *NAACP v. Medical Center,* 599 F.2d 1247 (3d Cir.1979). The question we must resolve is whether an allegation of discriminatory *effect* states a claim for this implied right of action under Title VI.

The United States, in its amicus brief, contends that "[b]y alleging that the action[s] taken by [defendants have] a disparate impact on minority residents and alleging factual support for such a claim, plaintiffs' complaint is sufficient to state a claim under Title VI and survive a motion to dismiss." Amicus Br. at 11. This contention, however, is at odds with Supreme Court jurisprudence in this area, as expressed in *Guardians Assoc. v. Civil Serv. Comm'n of N.Y.C.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), and clarified by Justice Thurgood Marshall when, writing for a unanimous Court in a later case, he explained:

In *Guardians,* we confronted the question whether Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* which prohibits discrimination against racial and ethnic minorities in programs receiving federal aid, reaches both intentional and disparate-impact discrimination. No opinion commanded a majority in *Guardians,* and Members of the Court offered widely varying interpretations of Title VI. Nonetheless, a two-pronged holding on the nature of the discrimination proscribed by Title VI emerged in that case. First, *the Court held that Title VI itself directly reached only instances of intentional discrimination.* Second, the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI.

*Alexander v. Choate,* 469 U.S. 287, 292–93, 105 S.Ct. 712, 715–16, 83 L.Ed.2d 661 (1985) (emphasis added).

We thus find that by alleging only discriminatory *effect* rather than discriminatory *intent,* plaintiffs failed in their complaint to allege a violation of Title VI. We shall therefore grant defendants' motion to dismiss Claim I of plaintiffs' complaint, but we·shall do so without prejudice to plaintiffs' right to amend their complaint to satisfy their pleading burden under Title VI if they do so in fifteen days.

*Implied Cause of Action Under Title VI Regulations*

■ Defendants further argue that plaintiffs have failed to state a cause of action in Claims II and III of their complaint, which allege that defendants violated EPA regulations promulgated under Title VI. Defs'. Br. at 4–5. Defendants argue that there is no private right of action under agency regulations such as these at issue here promulgated under § 602 of Title VI, and that therefore plaintiffs' claims must fail. Defs'. Br. at 4–11.

Our Court of Appeals, in examining whether a plaintiff must exhaust his or her administrative remedies before suing under Title VI itself, has held that there is no private right of action under regulations promulgated under Section 602 of Title VI. *Chowdhury v. Reading Hospital & Medical Center, supra.* In *Chowdhury,* our Court of Appeals found that:

Congress explicitly provided for an administrative enforcement mechanism, contained in Section 602, by which the funding agency attempts to secure voluntary compliance and, failing that, is empowered to terminate the violator's federal funding. Under the regulations promulgated pursuant to this section, an aggrieved individual may file a complaint with the funding agency but has no role in the investigation or adjudication, if any, of the complaint.

The only remedies contemplated by the language of the Act and the Regulations are voluntary compliance and funding termination. *There is no provision for a remedy for the victim of the discrimination, such as injunctive relief or damages.*

677 F.2d 317, 319–20 (emphasis added). The Court of Appeals based its holding that plaintiffs do not need to exhaust the administrative remedies under § 602 of Title VI upon the basic reality that those Title VI regulations give citizens no role in the enforcement of the administrative scheme, whose drastic remedy is the cut off of federal funds to the offending recipient agency. *Id.* at 321. *See also* Amicus Resp.Br. at 14 (noting that "the detailed administrative preconditions that the agency must meet before terminating financial assistance were intended as a safeguard in recognition of the severity of such an administrative remedy taken by a federal agency authorized to withhold federal funds.").

Plaintiffs attempt to use *Chowdhury* to illustrate the inadequacy of the EPA's administrative enforcement procedures.[5] Pls. Resp.Br. at 14. We agree with the defendants that "[p]laintiffs would have this court turn the holdings of *Medical Center* and *Chowdhury*—which found a private right of action under Section 601 because of a complainant's limited role under Section 602 regulations—on their head[s] and hold that because there is a private right of action under Section 601 there is also such a right under regulations promulgated pursuant to Section 602." Defs'. Reply Br. to Pls.Resp.Br. at 3–4 (alteration added). We decline plaintiffs' invitation to engage in this sort of judicial gymnastics in the face of what we regard as controlling authority.

We therefore find that there is no private cause of action under the EPA civil rights regulations promulgated pursuant to § 602 of Title VI. Defendants are therefore entitled

5. Plaintiffs also cite to a number of decisions from other Circuits which they claim support implication of a private right of action under the regulations. Pls.Resp.Br. at 12–13. Defendants argue that "[n]one of the cases analyze this question. Instead, to the extent that they even discuss the question, they rely on one another and

the Supreme Court's decisions in *Guardians Ass'n* ... and *Alexander."* Def. Reply Br. to Pls.Resp.Br. at 4–5. We find that the Supreme Court has never decided the question of whether there is an implied right of action under the regulations and that our Court of Appeals's *Chowdhury* decision is authoritative on us.

to dismissal of Claims II and III of plaintiffs' complaint with prejudice. An appropriate Order follows as to these claims.[6]

*ORDER*

AND NOW, this 5th day of November, 1996, upon consideration of defendants' motion to dismiss, plaintiffs' and amicus's responses thereto, defendants' reply briefs, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Defendants' motion to dismiss is GRANTED to the extent of the following paragraphs;

2. Claim I of plaintiffs' complaint is DISMISSED WITHOUT PREJUDICE to their right to file, by November 20, 1996, an amended complaint, if they can do so conformably with Fed.R.Civ.P. 11; and

3. Claims II and III of plaintiffs' complaint are DISMISSED WITH PREJUDICE.

---

**6.** Given our disposition of the motion, we leave to another day the resolution of the substantial Eleventh Amendment implications of plaintiffs' action.